# EXHIBIT "H"

## Dispute Resolution Provisions

ATTACHED TO AND MADE A PART OF THAT CERTAIN MOCCASIN JOINT OPERATING AGREEMENT BY AND BETWEEN

BP EXPLORATION & PRODUCTION INC. AND CHEVRON U.S.A. INC.

Dated June 28, 2008

## DISPUTE RESOLUTION PROCEDURE

1.1 **Resolution of Disputes.** For the purposes of the Agreement and this Exhibit, "Dispute" means any dispute or controversy arising out of the Agreement or the performance of any operations under the Agreement, including a Claim under this Agreement and any dispute or controversy regarding the existence, construction, validity, interpretation, enforceability or breach of this Agreement, and "Claim" means any claim, liability, loss, demand, damages, encumbrances, cause of action of any kind, obligation, costs, fines, proceedings, judgments, interest and award (including recoverable legal counsel fees and costs of litigation of the person or entity asserting the Claim and sums paid by way of settlement or compromise), whether arising by law, contract, tort, voluntary settlement or otherwise. The Parties shall exclusively and finally resolve any Dispute between them using direct negotiations, mediation and arbitration as set out in this Exhibit H, except as permitted in Section 1.6 of this Exhibit. A Party who violates the terms of this Exhibit shall pay all legal and consulting fees and costs incurred by the other Party in any suit, action, or proceeding to enforce it. While the procedures in this Exhibit are pending, each Party shall continue to perform its obligations under this Agreement, unless to do so would be impossible or impracticable under the circumstances.

1.2 **Direct Negotiations.** If a Dispute arises, a Party shall initiate the resolution process by giving notice setting out in writing and in detail the issues in Dispute and the value of the Claim to the other Party. If a Party refuses to toll all applicable statutes of limitations and defenses based upon the passage of time while the proceedings in this Section 1.2 are pending, the other Party may file an arbitration proceeding under Section 1.4 in an attempt to preserve its Claim and such proceeding shall be stayed by the arbitrator or arbitrators after appointment so that the Parties may continue efforts to resolve this Dispute as set out in this Section 1.2. A meeting between the Parties, attended by individuals with decision-making authority, must take place within thirty days from the date the notice was sent in an attempt to resolve the Dispute through direct negotiations.

1.3 **Mediation.** If the Dispute cannot be settled by direct negotiations within thirty days of initiation of the resolution process, either Party may initiate mediation by giving notice to the other Party. The place of mediation shall be Houston, Texas.

1.4 **Arbitration.** If the Dispute is not resolved by mediation within thirty days from the date of the notice requiring mediation, or if the Dispute is unresolved within sixty days from the date of the notice requiring direct negotiations, then the Dispute shall be finally settled by binding arbitration and either Party may initiate such arbitration by giving notice to the other Party. The arbitration shall be conducted in accordance with The International Institute for Conflict Prevention & Resolution ("CPR") Rules, except to the extent of conflicts between the CPR Rules at present in force and the provisions of this Agreement, in which event the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration shall be Houston, Texas.

1.5 The following provisions shall apply to any arbitration proceedings commenced pursuant to Section 1.4:

(A) The number of arbitrators shall be one if the monetary value of the Dispute is US$5,000,000 or less. The number of arbitrators shall be three if the monetary value is greater than US$5,000,000.

(B) The arbitrator or arbitrators must remain neutral, impartial and independent regarding the Dispute and the Parties. If the number of arbitrators to be appointed is one, that arbitrator or the presiding arbitrator if the arbitrators are three, must be a lawyer experienced in the resolution of disputes with experience relating to the issues in dispute.

(C) The Parties waive any Claim for, and the arbitrator has or arbitrators have no power to award consequential, punitive, loss production and /or profits, indirect or other non-compensatory damages. The arbitrator has or arbitrators have no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator has or arbitrators have the power to rule on objections concerning jurisdiction, including the existence or validity of this arbitration clause and existence or the validity of this Agreement.

(D) All arbitration fees and costs (with the exception of translation costs as specified above) shall be borne equally regardless of which Party prevails. Each Party shall bear its own costs of legal representation and witness expenses.

(E) The arbitrator is or arbitrators are authorized to take any interim measures as the arbitrator considers or arbitrators consider necessary, including the making of interim orders or awards or partial final awards. An interim order or award may be enforced in the same manner as a final award using the procedures specified below. Further, the arbitrator is or arbitrators are authorized to make pre- or post-award interest at applicable statutory interest rates during the relevant period.

(F)   The arbitrator or arbitrators must render a reasoned award in writing. This award shall be based upon a decision which must detail the finding of fact and conclusions of law on which it rests. The award is final and binding.

(G)   The Dispute will be resolved as quickly as possible. The arbitrator's or arbitrators' award must be issued within three months from completion of the hearing, or as soon as possible thereafter.

## 1.6   Enforceability.

(A)   The Parties waive irrevocably their right to any form of appeal, review or recourse to any court or other judicial authority, to the extent that such waiver may be validly made.

(B)   Except for proceedings to preserve Property pending determination by the arbitrator or arbitrators or to enforce an award, the mandatory exclusive venue for any judicial proceeding permitted in this Agreement is the court of competent jurisdiction in Houston, Texas. The Parties consent to the jurisdiction of these courts and waive any defenses they have regarding jurisdiction.

(C)   Proceedings to enforce judgment entered on an award may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

## 1.7   Confidentiality.

(A)   The Parties agree that any Dispute and any negotiations, mediation and arbitration proceedings between the Parties in relation to any Dispute shall be confidential and will not be disclosed to any third party.

(B)   The Parties further agree that any information, documents or materials produced for the purposes of, or used in, negotiations, mediation or arbitration of any Dispute shall be confidential and will not be disclosed to any third party.

(C)   Notwithstanding the foregoing, the Parties agree that disclosure may be made:

(1)   In order to enforce any of the provisions of this Agreement including without limitation, the Parties agreement to arbitrate, any arbitration order or award and any court judgment.

(2)   To the auditors, legal advisers, insurers and Affiliates of that Party to whom the confidentiality obligations set out in this Agreement shall extend.

(3)   Where that Party is under a legal or regulatory obligation to make such disclosure, but limited to the extent of that legal obligation.

(4)   With the prior written consent of the other Party.

(D)   The Parties agree to submit to the jurisdiction of the courts of Houston, Texas, for the purposes of any proceedings to enforce Section 1.7 of this Exhibit and shall prevent any information, documents or materials belonging to a Party from being used or disclosed by that Party for any purpose.

# EXHIBIT "I

Attached to and made a part of that certain Moccasin Operating Agreement dated June 1, 2009 by and between, Chevron U.S.A. Inc., as Operator and BP Exploration & Production Inc., as Non-Operator

# Well Data Trade and Confidentiality Agreement

Attached to and made a part of that certain Operating Agreement dated _____, 2007 by and between _____, as Operator, and _____, as Non-Operator

This Agreement ("Agreement") is made effective _____, 2009 (the "Effective Date") between BP Exploration & Production Inc. ("BP") and _____ (collectively "the _____ Parties") and _____ ("_____"), and _____ (collectively "the _____ Parties"). In this Agreement, the _____ Parties and the _____ Parties may be sometimes referred to individually as a "Party" or collectively as the "Parties."

## Recitals

The _____ Parties are the owners of the well data from the *Operator's Name, Protraction Area Name Block #*, OCS-G _____ No. 1 Well, identified on Exhibit "A" attached to and made a part of this Agreement (the "*Insert Prospect Name* Well Data").

The _____ Parties are the owners of the well data from the *Operator's Name, Protraction Area Name Block #*, OCS-G _____ No. _, Well(s), identified on Exhibit "B" attached to and made a part of this Agreement (the "*Insert Prospect Name* Well Data").

The Parties have agreed to exchange all of the *Insert Prospect Name* Well Data for all of the *Insert Prospect Name* Well Data, unless otherwise specified in this Agreement.

The Parties desire, by their execution of this Agreement, to set forth the terms and provisions of the well data exchange, and further desire to set forth the Parties' confidentiality obligations in regard to the well data received by each Party.

Accordingly, in consideration of the mutual advantages and benefits accruing to the Parties, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

### Definitions

**Affiliate:**
"Affiliate," means any corporation, company, limited liability company, partnership, or other legal entity that:

- is owned or controlled by a Party, or
- is owned or controlled by any other corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party, or
- owns or controls a Party, or
- is owned or controlled by a corporation, company, limited liability company, partnership, or other

legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity.

**Confidential Information:**
"Confidential Information" means (i) as to the _____ Parties, the *Insert Prospect Name* Well Data and any copies and reproductions thereof, and (ii) as to the _____ Parties, the *Insert Prospect Name* Well Data and any copies and reproductions thereof.

**Consultant:**
"Consultant" means an individual, corporation, company, limited liability company, partnership, financial analyst/institution, auditor or other legal entity that is engaged by a Party to evaluate, interpret, reprocess or make other technical studies of the well data received by that Party under the provisions of this Agreement, but shall not include one who is primarily engaged in the business of exploring for oil, gas, or other hydrocarbons.

**Disclose or Disclosure:**
"Disclose" or "Disclosure" means to display, show, reveal, or give access to, or permit to be viewed or accessed, the Confidential Information or any part thereof.

**Transfer:**
"Transfer" means a sale, assignment, trade, loan, conveyance, exchange, encumbrance, license, or other disposition of the Confidential Information.

**ARTICLE 2**

***(Insert Prospect Name)* Well Data**

2.1   **Grant of the *(Insert Prospect Name)* Well Data Use to the _____ Parties**
The _____ Parties grant to the _____ Parties the non-exclusive, non-transferable (except as provided herein), perpetual right to use the _____ Well Data under the terms and conditions of this Agreement.

2.2   ***(Insert Prospect Name)* Well Data Ownership**
The *Insert Prospect Name* Parties represent and warrant that they hold full ownership rights in and to the _____ Well Data. The _____ Well Data is proprietary to the _____ Parties and the _____ Parties maintain all trade secret and copyright interests in such data. Except as provided herein, the _____ Parties retain the exclusive right to Disclose or Transfer the _____ Well Data to other parties at any time and under whatever terms and conditions they consider acceptable, subject to the terms of the joint operating agreement between the _____ Parties.

2.3   **The _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer**
The _____ Parties agree to treat the _____ Well Data, and any copies and reproductions thereof, as confidential, agree to use the _____ Well Data only for their internal business purposes and the internal business purposes of their Affiliates, and agree not to Disclose or

Transfer the _____ Well Data, except as specifically permitted under this Agreement and shall exercise the same degree of care to safeguard the _____ Well Data as they would for their own Confidential Information of a similar nature.

2.4   **Exceptions to the _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer**

A.   Subject to Section 2.5, the _____ Parties, or each of them, may Disclose or Transfer the _____ Well Data to their Affiliate(s) provided that such Affiliate(s) agrees to the obligations of confidentiality and restrictions on Disclosure or Transfer of Confidential Information set forth in this Agreement.

B.   Subject to Section 2.5, the _____ Parties, or each of them, may Disclose the _____ Well Data, including providing copies of the _____ Well Data, to a Consultant retained by such Party ("the Disclosing *Insert Prospect Name* Party") to evaluate, reprocess, or interpret the _____ Well Data, provided that before any such Disclosure occurs, the Consultant must agree in writing that: (1) any evaluation, reprocessing or interpretation of the _____ Well Data is for the sole benefit of the Disclosing *Insert Prospect Name* Party, or its Affiliate, making the Disclosure, (2) the _____ Well Data will be maintained in accordance with Section 2.3 above and will not be Disclosed to any third party without the prior written permission of the _____ Parties, and (3) upon completion of its work, all electronic, paper and other copies of the _____ Well Data will be returned to the Disclosing _____ Party, or its Affiliate, making the Disclosure.

C.   The _____ Parties' obligation of confidentiality and restriction on Disclosure does not apply to the extent any portion of the _____ Well Data: (1) comes legally into the possession of the _____ Parties, or any of them, or the possession of an Affiliate, independent of this Agreement, or is legally divulged to the _____ Parties, or any of them, or an Affiliate, by a third party without limitation on disclosure, or (2) becomes part of the public domain through no fault or neglect of the _____ Parties, or any of them, or an Affiliate, or (3) must be disclosed to third parties under requirement of law, including, but not limited to, the regulations of the Minerals Management Service ("MMS") of the Department of Interior. In the event the _____ Parties are required by any rule, law or court order to disclose _____ Well Data, the _____ Parties shall immediately notify the _____ Parties and make reasonable efforts to cooperate in the _____ Parties' efforts to obtain any injunctive or protective orders that the _____ Parties may unilaterally deem desirable or necessary.

2.5   **Responsibility for Unauthorized Disclosure or Transfer**
The _____ Parties shall be responsible for ensuring that all persons to whom it Discloses or Transfers the _____ Well Data keep such Well Data confidential and not Disclose or Transfer such Well Data to any unauthorized person, and comply with the use restrictions set forth in this Agreement. No _____ Party shall be liable for any breach of this Agreement by any other _____ Party, and the _____ Parties agree to hold all such non-breaching _____ Party harmless for any breach of this Agreement by a breaching _____ Party.

2.6   **Paleo. Samples and Preparation**

3

The _____ Parties agree to make reasonably available to the _____ Parties raw cutting samples for all depths collected in the respective borehole(s) corresponding to the _____ Well Data. Raw cuttings should be in quantities sufficient to conduct standard preparations for foraminifera and nannofossil analyses. In the event that the quantity of raw cuttings are insufficient to conduct standard paleo analyses, the _____ Parties are each entitled to borrow the previously prepared foraminifera wash and nannofossil slides used for the _____ Parties' paleontological analyses. After the _____ Parties have completed the biostratigraphic analyses, the _____ Parties each agree to return all previously prepared foraminifera wash and nannofossil slide materials that were borrowed. Any unused, unprocessed raw materials provided to any of the _____ Parties will be returned after sample preparation is complete. Materials and residues resulting from sample processing (foram wash, nanno slurries, etc.) will become the property of the _____ Parties. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

## 2.7   Summary Reports

The _____ Parties agree to provide original paleontologic data in digital format, where possible, and to make reasonably available to the _____ Parties paleontological and biostratigraphic interpretations equivalent to or more detailed than what is provided to the MMS. The interpretations provided by the _____ Parties will be in the form of a summary of foraminiferal and nannofossil species events or "tops" and paleoenvironmental interpretations. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

## 2.8   Conventional Core

The _____ Parties agree to make reasonably available to the _____ Parties all conventional core data taken from all depths in the wellbore(s) which is part of the _____ Well Data. The _____ Parties shall be allowed to look at the conventional core photographs, as well as, physically inspect the conventional core at _____ Labs. The _____ Parties, individually, shall be allowed up to three physical inspection(s) of the conventional core within a period of one year from the date on which the last Party has executed this Agreement. Any costs associated with viewing the conventional core shall be at the sole cost of the viewing company. The _____ Parties shall also be allowed access to thin section samples made from conventional core and rotary cores, as well as petrographic (point count) data derived from the thin sections, and scanning electron microscopy (SEM) and X-Ray diffraction (XRD) data.

(Optional)

## 2.9   Data Being Withheld From *Prospect Name/Prospect Name* Trade

It is understood and agreed to between the _____ Parties and the _____ Parties that the Conventional Core data and the Palynostratigraphic Analysis from the *Insert Prospect Name* Well will not be made a part of this data exchange.

## ARTICLE 3

### *(Insert Prospect Name)* Well Data

## 3.1   Grant of the *(Insert Prospect Name)* Well Data Use to the _____ Parties

4

The _____ Parties grant to the _____ Parties the non-exclusive, non-transferable (except as provided herein), perpetual right to use the _____ Well Data under the terms and conditions of this Agreement.

3.2     *(Insert Prospect Name)* **Well Data Ownership**

The *Insert Prospect Name* Parties represent and warrant that they hold full ownership rights in and to the _____ Well Data. The _____ Well Data is proprietary to the _____ Parties and the _____ Parties maintain all trade secret and copyright interests in such data. Except as provided herein, the _____ Parties retain the exclusive right to Disclose or Transfer the _____ Well Data to other parties at any time and under whatever terms and conditions they consider acceptable, subject to the terms of the joint operating agreement between the _____ Parties.

3.3     <u>The _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer</u>

The _____ Parties agree to treat the _____ Well Data, and any copies and reproductions thereof, as confidential, agree to use the _____ Well Data only for their internal business purposes and the internal business purposes of their Affiliates, and agree not to Disclose or Transfer the _____ Well Data, except as specifically permitted under this Agreement and shall exercise the same degree of care to safeguard the _____ Well Data as they would for their own Confidential Information of a similar nature.

3.4     <u>Exceptions to the _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer</u>

A.     Subject to Section 3.5, the _____ Parties, or each of them, may Disclose or Transfer the _____ Well Data to their Affiliate(s) provided that such Affiliate(s) agrees to the obligations of confidentiality and restrictions on Disclosure or Transfer of Confidential Information set forth in this Agreement.

B.     Subject to Section 3.5, the _____ Parties, or each of them, may Disclose the _____ Well Data, including providing copies of such _____ Well Data, to a Consultant retained by such Party ("the Disclosing *Insert Prospect Name* Party") to evaluate, reprocess, or interpret the _____ Well Data, provided that before any such Disclosure occurs, the Consultant must agree in writing that: (1) any evaluation, reprocessing, or interpretation of the _____ Well Data is for the sole benefit of the Disclosing _____ Party, or its Affiliate, making the Disclosure, (2) the _____ Well Data will be maintained in accordance with Section 3.3 above and will not be Disclosed to any third party without the prior written permission of the _____ Parties, and (3) upon completion of its work, all electronic, paper and other copies of the _____ Well Data will be returned to the Disclosing _____ Party, or its Affiliate, making the Disclosure.

C.     The _____ Parties' obligation of confidentiality and restriction on disclosure does not apply to the extent any portion of the _____ Well Data: (1) comes legally into the possession of the _____ Parties, or any of them, or the possession of an Affiliate, independent of this Agreement, or is legally divulged to the _____ Parties, or any of them, or an Affiliate, by a third party without limitation on disclosure, or (2) becomes part of the public domain through no fault or neglect of the _____ Parties, or any of them, or an Affiliate, or (3) must be disclosed to third parties under requirement of law,

5

including, but not limited to, the regulations of the MMS.  In the event the _____ Parties are required by any rule, law or court order to disclose _____ Well Data, the _____ Parties shall immediately notify the _____ Parties and make reasonable efforts to cooperate in the _____ Parties' efforts to obtain any injunctive or protective orders that the _____ Parties may unilaterally deem desirable or necessary.

3.5   **Responsibility for Unauthorized Disclosure or Transfer**

The _____ Parties shall be responsible for ensuring that all persons to whom it Discloses or Transfers the _____ Well Data keep such Well Data confidential and not Disclose or Transfer such Well Data to any unauthorized person, and comply with the use restrictions set forth in this Agreement.  No _____ Party shall be liable for any breach of this Agreement by any other _____ Party, and the _____ Parties agree to hold all such non-breaching _____ Party harmless for any breach of this Agreement by a breaching _____ Party.

3.6   **Paleo. Samples and Preparation**

The _____ Parties agree to make reasonably available to the _____ Parties raw cutting samples for all depths collected in the respective borehole(s) corresponding to the _____ Well Data. Raw cuttings should be in quantities sufficient to conduct standard preparations for foraminifera and nannofossil analyses.  In the event that the quantity of raw cuttings are insufficient to conduct standard paleo analyses, the _____ Parties are each entitled to borrow the previously prepared foraminifera wash and nannofossil slides used for the _____ Parties paleontological analyses.  After the _____ Parties have completed the biostratigraphic analyses, the _____ Parties each agree to return all previously prepared foraminifera wash and nannofossil slide materials that were borrowed.  Any unused, unprocessed raw materials provided to any of the _____ Parties will be returned after sample preparation is complete. Materials and residues resulting from sample processing (foram wash, nanno slurries, etc.) will become the property of the _____ Parties. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

3.7   **Summary Reports**

The _____ Parties agree to provide original paleontologic data in digital format, where possible, and to make reasonably available to the _____ Parties paleontological and biostratigraphic interpretations equivalent to or more detailed than what is provided to the MMS. The interpretations provided by the _____ Parties will be in the form of a summary of foraminiferal and nannofossil species events or "tops" and paleoenvironmental interpretations. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

3.8   **Conventional Core**

The _____ Parties agree to make reasonably available to the _____ Parties all conventional core data taken from all depths in the wellbore(s) which is part of the _____ Well Data. The _____ Parties shall be allowed to look at the conventional core photographs, as well as, physically inspect the conventional core at _____ Labs. The _____ Parties, individually, shall be allowed up to three physical inspection(s) of the conventional core within a period of one year from the date on which the last Party has executed this Agreement. Any costs associated with viewing the conventional core shall be at the sole cost of the viewing company. The _____

6

Parties shall also be allowed access to thin section samples made from conventional core and rotary cores, as well as petrographic (point count) data derived from the thin sections, and scanning electron microscopy (SEM) and X-Ray diffraction (XRD) data.

(Optional)

**3.8    Data Being Withheld From *Prospect Name/Prospect Name* Trade**

It is understood and agreed to between the _____ Parties and the _____ Parties that the Conventional Core data and the Palynostratigraphic Analysis from the _____ Well will not be made a part of this data exchange.

**ARTICLE 4**
**General Provisions**

**4.1    Waiver of Representations and Warranties**

THE _____ WELL DATA AND THE _____ WELL DATA ARE PROVIDED "AS IS" AND EACH PARTY RECEIVING SUCH DATA ACKNOWLEDGES THAT IT IS ACCEPTING THE DATA "AS IS." SUBJECT TO ARTICLES 2.2 AND 3.2 CONTAINED HEREIN, THE RESPECTIVE OWNERS OF SUCH DATA MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR DESCRIPTION IN RESPECT THERETO, INCLUDING MERCHANTABILITY OR FITNESS FOR PURPOSE, AND SUCH DATA IS DELIVERED HEREUNDER WITH THE EXPLICIT UNDERSTANDING AND AGREEMENT THAT ANY ACTION A PARTY MAY TAKE BASED ON SUCH DATA RECEIVED SHALL BE AT THE PARTY'S OWN RISK AND RESPONSIBILITY AND SUCH PARTY SHALL HAVE NO CLAIM AGAINST THE OWNER OF SUCH DATA AS A CONSEQUENCE THEREOF.

**4.2    Grant of Well Data under Articles 2 and 3**

The respective sets of Well Data to be granted pursuant to Articles 2 and 3 is of equal value. The Parties will identify and agree, if at all, as to the data to be granted, to the extent that it is not already identified in this Agreement, before forty-five (45) days after the date of the first delivery of data, and the Parties will complete the grant of their respective sets of Well Data so that all Parties have received all data to be granted subject to this Agreement prior to the earlier of (1) one hundred and eighty (180) days after the date of the first delivery of data, or (2) the due date, including any extensions thereof, for any Parties' tax return for the year in which data is first delivered.

**4.3    Delivery of Well Data**

Except for [set forth reciprocal data not now available by both Parties], within _____ (__) days from the date on which the last Party hereto has executed this Agreement, the *Insert Prospect Name* Operator shall deliver to each of the _____ Parties the _____ Well Data, and the *Insert Prospect Name* Operator shall deliver to each of the _____ Parties the _____ Well Data. The contacts for purposes of arranging for delivery and receipt of the well data are set forth below:

*(INSERT PROSPECT NAME)* **PARTIES:**        *(INSERTPROSPECT NAME)* **PARTIES:**

Each of the following items:

7

[set forth reciprocal data not now available by both Parties]

shall be delivered within _____ (__) days of the day on which the _____ Operator notifies the _____ Operator in writing that it is in possession of these items in the quantities required in this Section 4.3.

4.4     **Term**

This Agreement shall remain in effect in perpetuity, however, the confidentiality obligations and disclosure restrictions of this Agreement, as to each referenced set of well data, are effective for a period of ____ (__) years from the Effective Date of this Agreement, or until and to the extent the applicable Confidential Information becomes publicly available through the MMS, whichever event occurs first. Following expiration of such confidentiality obligations and disclosure restrictions each Party may keep and use the well data received from the other Party hereunder without such obligations or restrictions.

4.5     **Assignment**

Each Party may Transfer this Agreement to an Affiliate. Otherwise, this Agreement may not be Transferred.

4.6     **Headings for Convenience**

Except for the definition headings contained in Article 1, all paragraph headings used in this Agreement are for convenience only and in no way define, limit, or describe the scope or intent of this Agreement or any part thereof; nor do the paragraph headings have any legal effect other than to aid in the reasonable interpretation of this Agreement.

4.7     **Entire Agreement**

This Agreement supersedes and replaces all oral or written communication between the Parties regarding their exchange and use of the _____ Well Data and the _____ Well Data.

4.8     **Drafting of Agreement and Construction**

The Parties each declare that they have contributed to the drafting of this Agreement or have had it reviewed by its counsel before signing it. Each agrees that this Agreement has been purposefully drawn and correctly reflects the understanding of the Parties regarding the subject transaction. In the event of a dispute between the Parties concerning the application or construction of this Agreement, the Parties agree that this Agreement will be construed fairly and reasonably and neither more strongly in favor or against any Party.

4.9     **Waiver**

A.     The rights of each Party may be exercised from time to time, by the Parties individually or jointly, and singularly or in combination with other rights.

B.     No waiver of any breach of a term, provision or condition of this Agreement by one Party shall be deemed to have been made by another Party hereto unless such waiver is in writing and signed by an authorized representative of such other Party. The failure of a Party to insist upon the strict performance of any term, provision or condition of this Agreement shall not be construed as a waiver or relinquishment in the future of the same or any other term, provision or condition.

8

**4.10**   <u>Relationship of the Parties</u>
This Agreement is not intended to be nor shall it be construed as a joint venture, association, partnership or other form of a business organization or agency relationship between the Parties.

**4.11**   <u>Severability</u>
If any term or other provision of this Agreement is determined by any court or other governmental agency of competent jurisdiction to be invalid, illegal or unenforceable, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect.

**4.12**   <u>Equitable Relief</u>
The Parties agree that the respective owners of the _____ Well Data and the _____ Well Data may be irreparably injured by a breach of this Agreement by a Party, and that the respective owners of such data will be entitled to seek equitable relief, including injunctive relief and specific performance, in the event of any breach of the provisions of this Agreement by a Party receiving such data. Such remedies will not be deemed to be the exclusive remedies for a breach of this Agreement, but will be in addition to all other remedies available to each respective owner of such data at law or equity.

Each Party waives the right to claim or recover incidental, consequential, indirect and punitive damages against all other Parties.

**4.13**   <u>Counterparts</u>
This Agreement may be executed by signing the original or a duplicate counterpart thereof. If this Agreement is executed in duplicate counterparts by the Parties, all such counterparts taken together will have the same effect as if all the Parties had signed the same instrument.

**4.14**   <u>Successors and Assigns</u>
This Agreement shall be binding upon and inure to the benefit of the Parties, their Affiliates, and their successors and permitted assigns.

### ARTICLE 5
### GOVERNING LAW AND RESOLUTION OF DISPUTES

**5.1**   **Governing Law.** This Contract is governed by, and interpreted under the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1 – 16 ("the Act") shall govern Section 5.

**5.2**   **Resolution of Disputes.** If any Dispute arises out of or in relation to this Contract and if the Dispute cannot be settled by direct negotiations, either Party may initiate mediation. If the Parties fail to settle the Dispute within thirty days of notice of mediation, either Party may initiate binding arbitration.

**5.3**   **The following provisions shall apply to arbitration proceedings:**
A.   The place of arbitration will be Houston, Texas.
B.   One arbitrator will conduct the arbitral proceedings in accordance with The International Institute for Conflict Prevention & Resolution ("CPR") Rules and CPR is the appointing authority.
C.   The arbitrator does not have the power to award, nor shall the arbitrator award, any punitive, indirect or consequential damages (however denominated). Each Party will

9

bear its own costs of legal representation and witness expenses.

D.   The arbitrator must render a reasoned award in writing.  This award shall be based upon a decision which must detail the findings of fact and conclusions of law on which it rests. The award is final and binding.

5.4   **The Dispute will be resolved as quickly as possible.**  The arbitration award must be issued within three months from completion of the hearing, or as soon as possible thereafter.

This Agreement is executed by each Party on the dates indicated below, but is effective for all purposes as of the Effective Date.

*(INSERT PROSPECT NAME)* **PARTIES**                *(INSERT PROSPECT NAME)* **PARTIES**

*COMPANY NAME*                                       *COMPANY NAME*

**By:** _____                      **By:** _____

**Title:** _____                   **Title:** _____

**Date:** _____                    **Date:** _____

*COMPANY NAME*                                       *COMPANY NAME*

**By:** _____                      **By:** _____

**Title:** _____                   **Title:** _____

**Date:** _____                    **Date:** _____

10

## Exhibit "A"

**Attached to and made a part of that certain Well Data Trade and Confidentiality Agreement between _____ and _____ and _____, dated effective _____, 2005.**

### *(Insert Prospect Name)* Well Data

*Insert Prospect Name* Well Data includes all data obtained from the (1) *Insert Protraction Area Name Insert Block # #1* _____ Prospect, ___*INSERT API #*___, OCSG-_____ 1, unless specifically excluded on this Exhibit "A".  The data set forth below may not be a complete list of the *Insert Prospect Name* Well Data

### Data Summary

| Type | Format | File name | Depth Range |
|---|---|---|---|
| LOGS | | | |
| LWD Digits | LAS | | |
| Prints | PDS | | |
| Wireline | | | |
| Mud Digits | LAS | | |
| Image | EMF/CGM | | |
| MDT | PDF | | |
| SURVEYS | | | |
| Directional Survey | TXT | | |
| VSP/Checkshot | | | |
| REPORTS | | | |
| Show Reports | PDF | | |
| Drilling Reports | PDF | | |
| PALEO | DIGITAL | | |
| DATA | | | |
| Geochemical Data | | | |

11

Data Summary
*Insert Protraction Area Name Block # #1* _____ Prospect
*Insert API #*
OCSG-_____ 1

| Type | Format | File name | Depth Range |
|---|---|---|---|
| **LOGS** | | | |
| LWD Digits | LAS | | |
| Images | PDS | | |
| Wireline | LAS | | |
| Images | PDF | | |
| Mud Digits | LAS | | |
| Image | EMF/CGM | | |
| MDT | PDF PDS | | |
| **SURVEYS** | | | |
| Directional Survey | TXT | | |
| VSP/Checkshot | | | |
| **REPORTS** | | | |
| Show Reports | PDF | | |
| Drilling Reports | PDF | | All Days |
| Side Wall Core Reports | | | |
| PALEO | | | |
| **DATA** | | | |
| Geochemical Data | | | |

The following data will be excluded from Exhibit "A":

12

- _____Well Core Data
- Palynostratigraphic Analysis


**\*\*\*\* END OF EXHIBIT "A" \*\*\*\***

# Exhibit "B"

**Attached to and made a part of that certain Well Data Trade and Confidentiality Agreement between** _____

and _____ and _____ and _____,

dated effective _____, 2005.

### *(Insert Prospect Name)* Well Data

*Insert Prospect Name* Well Data includes all data obtained from the *Insert Protraction Area Name* *Insert Block #* #1 OCS-G _____, unless specifically excluded on this Exhibit "B". The data set forth below may not be a complete list of the *Insert Prospect Name* Well Data

| Data Type | | ST01 | ST02 |
|---|---|---|---|
| | | _____ | |
| **1. Daily Reports and Surveys** | CD# CD# | | |
| Drilling Reports, Directional Surveys, Mudlogging Reports, Geologic reports, Mud reports | | | |
| **2. LWD Digits and Graphics** | BP00 _____ BP01 _____ BP02 _____ | CD# CD#? | CD# CD#? |
| ARC, iSONIC, APWD, DIR End of Well Report-Schlumberger | | _____' to _____' MD | _____' to _____' MD |
| **3. Mudlog Digits and Graphics** | CD# | CD# | CD# |
| Lithology, Gas Chromatograph End of Well Report-Sperry Sun Combo, Pressure, Show logs | | _____' to _____' MD | _____' to _____' MD |
| **4. Wireline Digits and Graphics** | CD# | | |
| GR, AIT, DEN, NEUT, CMR, DSI, OBMI, MDT | | N/A | _____' to _____' MD |
| **5. Paleo Data** | | | |
| Final Paleo Biostratigraphic Summary (Nanno and Foram) Reports | _____' to _____' MD BP00 _____' to _____' MD BP02 | _____' to _____' MD | _____' to _____' MD |
| **6. Geochemical Data** | Isotech CD# Baseline CD# | | |
| Mud Gas Isotube Analysis-Isotech Headspace Gas Analysis-Baseline MDT oil and Gas Data | | _____' to _____' MD | _____' to _____' MD |
| **7. MDT Oil and GAS Data** | CD# | | |
| _____ analysis | | N/A | _____' MD |
| **8. Side Wall Cores** | BP00 CD# BP02 CD#? | | |
| _____ Labs - cuttings & SWC | _____' to _____' cuttings from | N/A | N/A |

14

| | BP00,<br>_____' to _____' MD<br>SWC's from BP02 | | (C) D |
|---|---|---|---|
| Seismic | | | |
| Walk-away VSP raw data<br>Walk-away VSP processed image | N/A | N/A | _____' to _____' MD |

**Geochemical and Fluid Analysis Further Defined:**

Original Hole
1)
2)
3)
5)
6)
7)


BP01


BP02
1)
2)
3)
4)
5)
6)
7)

ST01
1)
2)


ST02
1)
2)
3)
4)

Baseline reports of MDT fluid geochemistry
1)
2)
3)
4)
5)

Isotech Data disk
1)
2)

Pencor and ADS oil and water reports
BP02
1)

15

2)
3)

ST02

The following data will be excluded from Exhibit "B":
- _____Well Core Data
- Palynostratigraphic Analysis

**\*\*\*\*END OF EXHIBIT "B" \*\*\*\***

## EXHIBIT "K"
## Safety, Health and Environment ("SHE")

ATTACHED TO AND MADE A PART OF THAT CERTAIN MOCCASIN JOINT OPERATING AGREEMENT BY AND BETWEEN
BP EXPLORATION & PRODUCTION INC. AND CHEVRON U.S.A. INC.
Dated June 1, 2009

### Safety, Health and Environmental Management Systems

1. <u>Plan Requirements for Operator:</u> Operator shall have an effective Safety & Environmental Management Plan ("SEMP"), in accordance with API RP75, or an equivalent standard, including Operator's internal policies, for all operations conducted under the Operating Agreement to which this Exhibit is attached.

2. <u>Overview of Plan for Non-Operators:</u> Upon the written request of any Non-Operator, the Operator will present to the Non-Operators, at a meeting called in accordance with the Operating Agreement, a sufficient overview of its Safety and Environmental Management systems to evidence compliance with Paragraph 1 herein.

3. <u>Operator's SHE Performance as an Agenda Item:</u> Upon written request, Operator's SHE performance shall be an agenda item for all meetings of the Parties where past SHE statistical performance as well as ongoing and future SHE improvement initiatives are presented and discussed.

### Safety, Health and Environmental Reporting

4. <u>Operator's Obligation to Notify Non-Operators:</u> The Operator shall notify the Non-Operators in a timely manner after any of the following incidents occur:
   (a)   well blow-out,
   (b)   oil spill greater than 50 barrels,
   (c)   fatality or accident resulting in lost time injuries of one (1) or more people,
   (d)   an incident where property damage is estimated to be in excess of $250,000; or
   (e)   an incident that causes a significant loss of production; and

   such notification will be followed by a written report.

5. <u>Maintenance and Non-Operator's Review of SHE Statistics:</u> SHE statistics for activities and operations conducted under the Operating Agreement will be maintained and be accessible to Non-Operators in accordance with the provisions of this Operating Agreement. SHE statistics are defined as: Recordable Injuries, Lost Time Injuries, Lost Time Injury Frequency, Reportable Spills, Fines or Incidents of Non-compliance (all as defined by OSHA). In addition to opportunities to review data through audits, Operator will, upon written request, furnish SHE performance information annually and be amenable to an annual meeting with Non-Operators specifically to review and discuss performance of the Production System, Facility(s) or operation(s) applicable to this Operating Agreement.

### Safety, Health and Environmental Inspections

6. <u>Non-Operator's Right of Access:</u> For purposes of conducting environmental and safety inspections and audits, the Non-Operators shall have the right of access to activities and operations and shall have access to Operator's files as provided for in this Operating Agreement. Operator will cooperate fully in these environmental and safety audits.

EXHIBIT "M"

Attached to and made a part of that certain Moccasin Operating Agreement dated
June 1, 2009, by and between Chevron U.S.A. Inc., as Operator, and
BP Exploration & Production Inc., as Non-Operator

MEMORANDUM OF OPERATING AGREEMENT MORTGAGE,
PLEDGE, SECURITY AGREEMENT, AND FINANCING
STATEMENT COVERING

1.0    This Memorandum of Operating Agreement, Mortgage, Pledge, Security Agreement, and
       Financing Statement (hereinafter called "Memorandum") is effective as of June 1, 2009 and is
       entered into by the undersigned Parties (each of which is hereinafter called "Party" and all of
       which are hereinafter called "Parties").

2.0    The Parties have entered into that certain Operating Agreement identified in Attachment I hereto
       (hereinafter called "Operating Agreement") to explore, develop, and operate the lands and
       lease(s) described in Attachment I hereto (hereinafter called "Lands and Lease(s)") and to
       produce oil and gas (including condensate and liquefiable substances entrained in the gas stream)
       therefrom and have designated the Party identified in Attachment I as Operator to conduct such
       operations for itself and on behalf of the rest of Parties hereto as Non-Operators, as set forth in
       Attachment I.

3.0    The Operating Agreement provides for certain liens, mortgages, pledges and security interests.
       The Operating Agreement contains an accounting procedure, along with other provisions, which
       provide for the payment of interest on past-due amounts and supplements the lien, mortgage, and
       security interest provisions, and also includes non-consent clauses which provide that Parties who
       elect not to participate in certain operations shall be deemed to have relinquished their interest in
       production until the carrying consenting Parties are able to recover their costs of such operation
       plus a specified amount. In some cases, a Non-Participating Party will be deemed to have
       relinquished all rights in some or all of the Lands and Leases, without the opportunity to recover.
       Should any person or entity desire additional information regarding the Operating Agreement or
       wish to inspect a copy of the Operating Agreement, that person or entity should contact the
       Operator.

4.0    The purpose of this Memorandum is to more fully describe the liens, mortgages, pledges and
       security interests provided for in the Operating Agreement, and to place third parties on notice
       thereof, and to restate, grant and convey the same to the extent required to perfect the same fully
       in accordance with applicable state law.

5.0    To secure payment and performance by each Party of all its current and future obligations under
       the Operating Agreement (including, but not limited to, payment by each Party of its share of
       costs, plus attorneys fees, court costs, related collection costs and accrued interest on unpaid
       amounts due from time to time under the Operating Agreement, and the timely and proper
       payment by Operator to independent contractors and other persons entitled thereto performing
       work for the Joint Account of all sums advanced from time to time by the Non-Operators

1

Moccasin JOA Exhibit "M" – Memorandum of OA

pursuant to the terms of the Operating Agreement), the Parties have agreed and do hereby agree as follows:

5.1   The Operator shall conduct and direct and have full control of all operations on the Lands and Leases, as permitted and required by, and within the limits of the Operating Agreement.

5.2   The liability of the Parties under the Operating Agreement and this Memorandum shall be several, not joint or collective.  Each Party shall be responsible only for its obligations and shall be liable only for its proportionate share of costs under the Operating Agreement and this Memorandum.

5.3   Each Party grants to each of the other Party(ies) a first mortgage and lien upon all its right, title and interest in the Lands and Lease(s), and a pledge and security interest in its share of oil and gas when extracted and its interest in all equipment and property, including fixtures, whether movable or immovable, corporeal or incorporeal located upon and/or used or useful in the production of oil and gas from such Lands and Lease(s) (all such property/ being more fully described in Paragraph 6.0)  To the extent that a Party has a security interest under the Uniform Commercial Code, such Party shall be entitled to exercise the rights and remedies of a secured party  under the Operating Agreement and this Memorandum under the Code.  The bringing of a suit and the obtaining of judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the rights or security interest for the payment thereof.  To the extent applicable state law requires liquidation of the same for the mortgage to be enforceable, the maximum amount of the obligation to be secured from time to time by each such lien and mortgage shall be $25 million ($25,000,000.00); otherwise the maximum amount of the obligation to be so secured shall be unlimited.  Notwithstanding the foregoing maximum amount of $25 million ($25,000,000.00), the liability of each Party as under the Operating Agreement and this Memorandum and the mortgage, lien, and security interest granted hereby shall be limited (and Operator shall not be entitled to enforce the same against each Party for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys fees, and other charges provided for in the Operating Agreement or in this Memorandum)  outstanding and unpaid and that are attributable to or charged against the interest of such Party  pursuant to the Operating Agreement.

5.4   If any Party fails to pay its share of costs under the Operating Agreement when due, Operator may require other Parties to pay their proportionate part of the unpaid share, whereupon each such Party shall be secured by the mortgage and lien, pledge and security interest stated herein and such paying party shall be subrogated to the security rights of Operator against the non-paying Party arising under the Operating Agreement and this Memorandum.

6.0   Each Party, as debtor and mortgagor,  grants to each of the other Parties, as secured party and mortgagee, a first mortgage and lien, pledge and security interest in and to the following collateral, to the extent such collateral is susceptible of mortgage, pledge and security interest, whether now owned or existing or hereafter acquired:

2

Moccasin JOA Exhibit "M" – Memorandum of OA

6.1   <u>Collateral Subject to Liens, Pledges, and Security Interest</u>

   (A)   All personal property located upon and/or used or useful in the production of oil and gas from such Lands and Lease(s), including things constituting "Facilities", "Pipelines", "Flowlines", "Wells" and "Platforms" under the Operating Agreement.

   (B)   All equipment and appurtenances, including fixtures, whether movable or immovable, corporeal or incorporeal located upon and/or used or useful in the production of oil and gas from the Lands and Lease(s), including things constituting "Facilities", "Pipelines", "Flowlines", "Wells" and "Platforms" under the Operating Agreement.

   (C)   Oil and gas (including condensate and liquefiable substances entrained in the gas stream) in and under the Lands and Lease(s) which may be extracted therefrom.

   (D)   All accounts resulting from the sale of the items described in Subparagraph (C) at the wellhead of every well located and/or producing oil and gas from the Lands and Lease(s) or on lands pooled or unitized therewith.

   (E)   All items used, useful, or purchased for the production, treatment, storage, transportation, manufacture, or sale of the items described in Subparagraph (C).

   (F)   All rights under any gas balancing agreement, general intangibles, contract rights (including farmout rights, option farmout rights, acreage and or cash contributions, conversion rights, contracts for drilling and contract for the fabrication of items listed in Subparagraphs (A) and (B) above) to the extent such rights and intangibles relate to the Lands and Lease(s).

   (G)   All interests in any limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lands and Lease(s) or in any other collateral encumbered by this Memorandum.

   (H)   All the proceeds and products of the items described in the foregoing Subparagraphs, and all substitutions therefore, replacements thereof, or accessions thereto.

6.2   <u>Collateral Subject to Mortgages and Liens</u>

   (A)   The Lands and Lease(s), including all oil and gas thereunder which may be produced therefrom.

   (B)   All equipment and appurtenances, including fixtures, whether movable or immovable, corporeal or incorporeal located upon and/or used or useful in the production of oil and gas from such Lands and Lease(s), including things constituting "Facilities", "Pipelines", "Flowlines", "Wells" and "platforms" under the Operating Agreement.

3

    (C)  All easements, rights of way and other real property interests located upon and/or used or useful in the production of oil and gas from such Lands and Lease(s).

7.0  The accounts described in Paragraphs 6.1(D) will be financed at the wellhead of the well or wells located on and/or producing oil and gas from the Lands and Lease(s), and this Memorandum shall be filed for record in the Real Estate Records of the county(ies) and/or parish(es) adjacent thereto, with office of the Minerals Management Service having oversight responsibility for the Lands and Lease(s) and in the appropriate Uniform Commercial Code and/or Louisiana Commercial Laws-Secured Transactions, records as the case may be. All Parties who are signatories to the Operating Agreement as of the date this Memorandum is executed are identified on Attachment I.

8.0  On default of any covenant or condition of the Operating Agreement, and after notice and opportunity to cure has been given and the defaulting Party has failed to cure such default pursuant to the Operating Agreement, in addition to any other remedy afforded by law, each Party and any successor to such Party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to take possession of and sell any interest which the defaulting Party has in personal property collateral described in Paragraphs 6.1 and 6.2 and to foreclose the lien, mortgage, pledge, and security interest in the manner provided by law.

9.0  Upon expiration of the Operating Agreement and the satisfaction of all debts thereunder, within thirty (30) days after receiving a written request from any Party, the Operator shall file of record with respect to the Operating Agreement and this Memorandum a release and termination on behalf of all Parties. Absent such request, Operator shall not be required to file such release or termination if the security rights hereunder have lapsed or will lapse, by operation of law, as a consequence of a continuation statement and/or reinscription notice not being filed. If such release and termination is filed, all benefits and obligations under this Memorandum shall terminate as to all Parties with respect to the expiring Operating Agreement. Operator or any other Party shall have the right to file a continuation statement and/or reinscription notice on behalf of all Parties.

10.0  It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is by the courts held to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

11.0  This Memorandum shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective legal representatives, successors, and permitted assigns. The failure of one or more persons owning an interest in the Lands and Lease(s) to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who have executed this Memorandum.

12.0  A person or entity having a working interest in the Lands and Lease(s) may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying person or entity had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such Party hereby consents to its ratification and adoption by any person or entity who may have or may acquire any interest in the Leases.

4

Moccasin JOA Exhibit "M" – Memorandum of OA

13.0   This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording, only one copy of this Memorandum with individual signature pages attached thereto needs to be filed of record as provided in Paragraph 7.0. Each Party authorizes the filing by any other Party of an original, a certified copy thereof, and/or any photocopy of this Memorandum as a financing statement under the Uniform Commercial Code.

14.0   The provisions of this Memorandum shall govern in the event of any conflict with the Operating Agreement.

15.0   To the extent this transaction is governed by Louisiana law, this instrument, when filed for registry, is intended to function as both a filed agreement and a declaration and is intended to create a conventional mortgage as provided under Louisiana Civil Code, Articles 3287-3298.

WITNESSES:

                                              BP Exploration & Production Inc.

_____                       By:_____

                                                    Kemper Howe
                                                    Attorney-in-Fact

_____                       Date:_____

                                              Address:  501 Westlake Park Blvd.
                                                        Houston, TX  77079

                                              U.S. Employer Identification No.:

WITNESSES:

                                              Chevron U.S.A. Inc.

_____                       By:_____

_____                       Date:_____

                                              Address:  1500 Louisiana St.
                                              Houston, TX 77002

                                              U.S. Employer Identification No.:

5

Moccasin JOA Exhibit "M" – Memorandum of OA

6

Moccasin JOA Exhibit "M" – Memorandum of OA

**ACKNOWLEDGMENTS**

STATE OF TEXAS

COUNTY OF _____

On this _____ day of _____, _____, before me, appeared _____ to me personally known, who, being by me duly sworn, did say that he is the _____ of _____, and that the foregoing instrument was signed in behalf of that corporation by authority of its Board of Directors and _____ acknowledged the instrument to be the free act and deed of that corporation.



_____
NOTARY PUBLIC



STATE OF TEXAS

COUNTY OF _____

On this _____ day of _____, _____, before me, appeared _____ to me personally known, who, being by me duly sworn, did say that he is the _____ of _____, and that the foregoing instrument was signed in behalf of that corporation by authority of its Board of Directors and _____ acknowledged the instrument to be the free act and deed of that corporation.



_____
NOTARY PUBLIC



7

Moccasin JOA Exhibit "M" – Memorandum of OA

ATTACHMENT "1"

Attached to and made a part of that certain Memorandum of Operating Agreement dated effective _____ between BP Exploration & Production Inc. and Chevron U.S.A. Inc. covering the Moccasin Prospect

## DESCRIPTION OF LEASES IN THE CONTRACT AREA, WORKING INTEREST OF THE PARTIES, OPERATOR AND REPRESENTATIVES

I.   **Contract Area(s)**

| Area | Block | OCS-G # | Royalty | Depths Covered |
|------|-------|---------|---------|----------------|
|      |       |         |         |                |

II.  **Working Interest of the Parties**                    **Percentage**

   BP Exploration & Production Inc.                              XX.000%
   Chevron U.S.A. Inc.                                           XX.000%

III. **Operator**
   Chevron U.S.A. Inc.

IV.  **Representatives**

   **Addresses, Phone and Fax No.**                      **Names of Representatives**

   BP Exploration & Production Inc.                       Kemper Howe
   501 WestLake Park Blvd                                 Offshore Land Manager
   Houston, Texas   77079                                 (281) 366-1278
   Facsimile:  (281) 366-7569


   Chevron U.S.A. Inc.                                    J. Keith Couvillion
   1500 Louisiana St.                                     Land Manager
   Houston, Texas 77002                                   (832) 854-3653
   Facsimile : (832) 854-2663

8

Moccasin JOA Exhibit "M" – Memorandum of OA

# OPERATING AGREEMENT
## OUTER CONTINENTAL SHELF - GULF OF MEXICO

**THIS AGREEMENT** is made effective as of June 1, 2007 ("Effective Date"), by and between REPSOL E&P USA Inc. ("Repsol") and Chevron U.S.A. Inc. ("Chevron"), the signers hereof, who are herein referred to collectively as "Parties" and individually as "Party".

**WHEREAS,** the Parties are owners of one or more Outer Continental Shelf oil and gas leases, identified in Exhibit "A" and desire to explore and develop, and operate these leases lying within the Contract Area for the production of oil, gas and associated Hydrocarbons in commercially producible quantities.

**WHEREAS,** the Parties herein enter into this Agreement for the exploration, development, production and operation of the Contract Area henceforth from the effective date of this Agreement.

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties agree to explore, develop and operate the Contract Area according to the following provisions:

## ARTICLE 1.0 CONTRACT APPLICATION

1.1  **Application in General:**  This Agreement applies to the exploration, development and operation of the Contract Area for the production of Hydrocarbons therefrom and the transportation of same by pipeline(s) or otherwise from the Contract Area.

1.2  **Application to Contract Area:**  This Agreement shall apply to the Contract Area as defined in Article 2.0 below.  Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Contract Area, all property and all Hydrocarbons produced from the Contract Area shall be owned by the Parties according to their respective Working Interests in the Leases.

1.3  **Preparation and Effect of Future Unit Operating Agreements:**  Subject to Articles 1.3.1 and 1.3.2 below, if unitization occurs with respect to one or more Leases covered by this Agreement, then (i) the unitized acreage shall be deemed governed by an operating agreement, incorporating identical terms and

**Exhibit A-2**

conditions as contained in this Agreement (unless clearly inappropriate or if in conflict with the terms and conditions in the applicable unit operating agreement), ii) the Operator of the unitized acreage shall promptly prepare such unit operating agreement, and (iii) the execution of such unit operating agreement shall be considered a mere formality. On the effective date of the unit, the Leases included in the unit shall no longer be subject to the terms of this Agreement (and Exhibit "A" shall be revised to reflect this change).   If fewer than all Leases are included in a unit, then the provisions of Article 1.3.3 (*Unitization and Creation of a New Contract Area*) shall apply.

1.3.1   **Operator Under Unit Operating Agreement:** Subject to Article 4.1, the Party designated as the Operator in the unit operating agreement will be the same Party that is Operator pursuant to this Agreement prior to unitization.

1.3.2   **Unitization's Effect on Approved Development Plans:** In the following circumstances the unit operating agreement shall incorporate an approved Development Plan (unless the Participating Parties in the approved Development Plan unanimously agree not to incorporate it):

(a)   all the Leases to be developed under an approved Development Plan are included in the unit, or

(b)   fewer than all Leases to be developed under an approved Development Plan are included in the unit provided that the approved Development Plan can be implemented, with respect to such unitized Leases, without making a major modification, as defined in Article 12.10 (*Major Modifications to Development Plans*).

In all other circumstances, an approved Development Plan shall only be incorporated into the unit operating agreement if the Participating Parties in the approved Development Plan unanimously agree.

1.3.3   **Unitization and Creation of a New Contract Area:** If a unit is formed which is composed of less than all the Leases or portions thereof, then the excluded acreage shall become a new Contract Area under this Agreement with Exhibit A amended accordingly unless the Parties unanimously agree otherwise prior to the effective date of the unit.

## ARTICLE 2.0  DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto) the initially capitalized terms listed below shall have the following meanings:

**2.1** <u>Affiliate</u>: shall mean a corporation, company, limited liability company, partnership, or other legal entity that:

    (a)    is owned or controlled by a Party,

    (b)    is owned or controlled by another corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party,

    (c)    owns or controls a Party, or

    (d)    is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity.

**2.2** <u>Agreement</u>: shall mean this Operating Agreement, together with its attached Exhibits.

**2.3** <u>Annual Operating Plan</u>: shall mean the operational plan and estimate of Costs for operations in the next ensuing calendar year as described in Article 6.7 *(Annual Operating Plan)*.

**2.4** <u>Appraisal Operations</u>: shall mean all operations conducted subsequent to the conclusion of Exploratory Operations, until such operations are concluded pursuant to Article 11.7 *(Conclusion of Appraisal Operations)*.

**2.5** <u>Appraisal Well</u>: shall mean any well proposed and drilled as an Appraisal Operation.

**2.6** <u>Authorization For Expenditure (AFE)</u>: shall mean an authorization for expenditures containing the written description of a proposed operation along with an estimate of Costs for an operation in such detail as is customary for the offshore Gulf of Mexico.  An AFE, when executed by a Party, evidences that Party's Election to participate in the proposed operation and grants the Operator the authority to commit or expend funds on behalf of the Participating Parties to conduct the operation.

**2.7** <u>Confidential Data</u>: shall mean all proprietary geophysical, geological, geochemical, drilling or engineering data owned or developed by the Parties relating to operations conducted within the Contract Area.  The term shall also include (but may not be limited to):

    o  certain commercial, contractual or financial information,

    o  analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Information

o  both originals and copies of geological and geophysical data, and well logs, and

o  all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement..

Confidential Data does not include "Confidential Work Product" as such term is defined in Exhibit "G" (*Integrated Project Team*")

**2.8**  **Contract Area:** shall mean the OCS blocks listed on Exhibit "A" and covered by the Leases subject to this Agreement.

**2.9**  **Cost(s):** shall mean the monetary amount of all expenditures (or indebtedness) incurred by the Operator and the Participating Parties for (or on account of) any and all operations conducted pursuant to this Agreement and determined pursuant to this Agreement, including the Accounting Procedure attached as Exhibit "C".

**2.10**  **Development Operations:** shall mean all operations other than Exploratory and Appraisal Operations conducted within the Contract Area.

**2.11**  **Development Phase:** shall mean Development Operations associated with the installation of a Production System.

**2.12**  **Development Plan:** shall mean the plan for fabricating and/or installing a Production System and developing and producing Hydrocarbons from the Contract Area as described in Article 12.0 (*Development Plans).*

**2.13**  **Development Well:** shall mean any well proposed and drilled as a Development Operation or a well in which Development Operations are being conducted.

**2.14**  **Disproportionate Spending Settlement:** shall mean the settlement of an underinvestment by a Non-Participating Party paying a disproportionate amount of Costs in the next operation in which the Non-Participating Party makes an Election to participate.

**2.15**  **Election, Elects, Electing:** shall mean a decision by a Party to either participate or to become a Non-Participating Party in a proposed operation (including the AFE associated with the operation). A Party's execution of the AFE shall be considered an affirmative Election to participate in a proposed operation.

**2.16**  **Exploratory Operation:** shall mean all operations (including any Sidetracks or any substitute well) conducted in accordance with the provisions of Article 10.0.

**2.17**  **Exploratory Well:** shall mean any well drilled pursuant to Article 10.0 until the conclusion of Exploratory Operations as provided in Article 10.5.

**2.18**  Expendable Well:  shall mean a well drilled for purposes of obtaining data and information, and not intended to be completed and produced under the Well Plan.

**2.19**  Fabrication AFE:  shall mean the AFEs collectively submitted pursuant to an approved Development Plan for the construction or acquisition, and installation of a Production System and related Facilities.

**2.20**  Facilities:  shall mean all production equipment beyond the wellhead connections that is installed on or outside the Contract Area pursuant to this Agreement in order to handle or process Hydrocarbon production.  Facilities include, but are not limited to, injection and disposal wells and the flowlines and gathering lines that transport Hydrocarbons from the wellhead to the Production System.  Facilities exclude (1) offshore surface structures, whether fixed, compliant, or floating, (2) offshore subsea structures or templates, whether capable of accommodating one well or multiple wells, (3) pipelines used to transport Hydrocarbons or produced water to shore or to pipeline interconnections located downstream of the Production System, and (4) the facilities to take in kind provided for in Article 15.2 (Facilities to Take in Kind).

**2.21**  Final Design AFE:  shall mean the AFE included as part of the Development Plan pursuant to Article 12.5 (Content of Development Plan).

**2.22**  General Matters:  shall mean all matters decided by a vote of the Parties in accordance with Article 8.2 (Voting Procedures on General Matters).

**2.23**  Gross Negligence or Willful Misconduct:  shall mean any act, or failure to act (whether sole, joint or concurrent), by a Party's corporate officers, regular salaried supervisory staff or non-supervisory staff at a level comparable to an area manager or superior to such position functioning at an equivalent level, which was intended to cause, or which was in reckless disregard of or wanton indifference to, harmful consequences such person knew, or should have known, such act or failure to act would have on the safety or property of another person or entity not justifiable by any special circumstances.  The defined term Gross Negligence or Willful Misconduct shall not include any error or judgement or mistake made by the aforesaid persons while exercising in good faith any function, authority, or discretion conferred upon them under this Agreement.

**2.24**  Hydrocarbons:  shall mean the oil and gas and associated liquid and gaseous by-products (except helium) which may be produced from a wellbore located on the Contract Area.

**2.25**  Initial Production System:  shall mean the Production System and accompanying Facilities included in the first approved Development Plan.

**2.26**   Integrated Project Team: shall mean the representatives of the Parties assigned to prepare a Development Plan pursuant to Exhibit "G".

**2.27**   Initial Test Well: shall mean the first Exploratory Well commenced pursuant to this Agreement.

**2.28**   Joint Account: shall mean the account maintained by the Operator under this Agreement, showing the charges paid and credits received in connection with the activities and operations conducted under this Agreement.

**2.28**   Lease: shall mean each OCS federal oil and gas lease (or portion thereof) identified in Exhibit "A" attached hereto and the lands affected that are within the Contract Area.

**2.30**   MMS: shall mean the Minerals Management Service of the Department of the Interior of The United States of America and any successor to the responsibility of such agency to oversee and regulate oil and gas activities in offshore waters of The United States of America.

**2.31**   Non-Consent Well: shall mean an Exploratory Well, Appraisal Well or Development Well drilled as a Non-Consent Operation.

**2.32**   Non-Consent Operations: shall mean Exploratory Operations, Appraisal Operations, or Development Operations for which one or more Parties, having the contractual right to do so, makes an Election not to participate in the proposed operation; and where the Operator (or substitute Operator) proceeds to conduct the operation at the Participating Parties' sole Cost and risk pursuant to the provisions of Article 16.0 *(Non-Consent Operations)*.

**2.33**   Non-Operating Party: shall mean any Party to this Agreement other than the Operator (or a substitute Operator).

**2.34**   Non-Participating Party: shall mean any Party to this Agreement who, having the contractual right to do so, makes an Election not to participate in the proposed operation and who is subject to the provisions of Article 16.0 *(Non-Consent Operations)*.

**2.35**   Non-Participating Party's Share: shall mean the share of Working Interest and Costs that a Non-Participating Party would have assumed if all Parties had made an Election to participate in the proposed operation.

**2.36**   Objective Depth: shall mean, for any well, the shallower of the total footage to be drilled (as measured in total vertical depth) or the penetration by the drill bit sufficient to test the deepest target formation or interval, said depth and

formation (together with a bottomhole location) as set forth in the proposed Well Plan and AFE.

**2.37** <u>Operator</u>: shall mean the Party identified in Article 4.1 *(Designation of Operator)* charged with the responsibility of conducting all operations on behalf of the Participating Parties. The term shall also refer to any successor or substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)*, or Article 4.5 *(Selection of Successor Operator)*.

**2.38** <u>Participating Interest:</u> shall mean a Participating Party's percentage of participation in the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement; that is, the proportion that the Party's Working Interest bears to the total Working Interest of all the Participating Parties (unless a different Cost sharing basis has been agreed upon by the Participating Parties in such operation).

**2.39** <u>Participating Party:</u> shall mean a Party who makes an Election to participate in sharing the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement. If the Parties have agreed upon a different Cost sharing arrangement, those Parties shall be considered Participating Parties for all purposes of this Agreement.

**2.40** <u>Production System:</u> shall mean a system located within the Contract Area to develop and produce Hydrocarbons. The term includes:

    (i)    an offshore surface structure, whether fixed, compliant, or floating, and

    (ii)    an offshore subsea structure or template, whether capable of accommodating one well or multiple wells, and

    (iii)    any combination of (i) and (ii), and

    (iv)    any other type of system designed to develop and produce Hydrocarbons, and

    (v)    all associated components of any of the above.

The term excludes Facilities, mobile offshore drilling units, and the facilities referred to in Article 15.2 (Facilities to Take in Kind).

**2.41** <u>Producible Well:</u> shall mean a well a) producing Hydrocarbons; or, b) if not producing, a well that shall at least meet the "well producibility" criteria set forth in 30 CFR 250.115 and 250.116 (effective January 27, 2000) or any succeeding order issued by an appropriate governmental authority; or c) is deemed a Producible Well by unanimous approval of the Participating Parties even if the well is plugged and abandoned.

**2.42** <u>Producible Reservoir:</u> shall mean a Hydrocarbon accumulation into which a Producible Well has been drilled and which is separated from and not in oil or

gas communication with any other such accumulation and identified as a Hydrocarbon bearing accumulation expected to be developed under any Development Plan or any other accumulation from which Hydrocarbons are ultimately produced.

2.43 <u>Recompletion:</u>  shall mean a Development Operation in a single well bore in which a completion in one Producible Reservoir is abandoned in order to attempt a completion in a different Producible Reservoir.  To "Recomplete" means to conduct a Recompletion.

2.44 <u>Sidetrack or Sidetracking:</u> unless otherwise qualified, shall mean an operation to directionally control or intentionally deviate the drilling of a well (other than to straighten the hole, core the formations encountered or to avoid obstructions or other mechanical difficulty) for the purpose of changing the bottomhole location to another bottomhole location not specified in the most recently approved Well Plan for the well, provided that such new bottomhole location is not deeper than the stratigraphic equivalent of the original Objective Depth.

2.45 <u>Subsea Production System:</u>  shall mean an offshore subsea structure or template and the components thereof (including flow lines and control systems), which are attached to the sea floor for use in obtaining Hydrocarbon production from a well not drilled from a Production System.

2.46 <u>SOO:</u>  shall have the meaning ascribed to it under Article 8.3.6.

2.47 <u>SOP:</u>  shall have the meaning ascribed to it under Article 8.3.6.

2.48 <u>Subsequent Production System:</u> shall mean any new or expanded Production System proposed to be installed after the installation of the Initial Production System.

2.49 <u>Transfer of Interest:</u> shall mean a conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's undivided Working Interest.

2.50 <u>Well Plan:</u> shall mean the description of operations, tests, evaluation and other activities described in Article 10.1.1 *(Well Plan's Minimum Specifics)* which are proposed as a part of an Exploratory, Appraisal or Development Operation.

2.51 <u>Working Interest:</u>  shall mean the record title leasehold interest or, where applicable, the operating rights of each Party in and to each Lease, and the interest of each Party in the personal property on the Contract Area (expressed as the percentage set forth in Exhibit "A"). If a Party's record title interest is different from its operating rights, then the Working Interest, as expressed by the

percentages set forth in Exhibit "A", shall be calculated using only the Party's operating rights.

**2.52   Workover:**  A Development Operation conducted in an existing well after the well has been completed in one or more Producible Reservoirs to restore, maintain, or improve production from one or more of those Producible Reservoirs.

**2.53   Work Plan:** shall mean the operational plan for operations.

## ARTICLE 3.0
## EXHIBITS

**3.1   Exhibits:** All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement. Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement by this reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.  If the provisions of any of the Exhibits, except Exhibits "D" and "G", conflict with any provisions of this Agreement, the provisions of this Agreement shall prevail unless a different priority for interpretation is stated in the attached Exhibits.  If a provision of Exhibit "D" or "G" is inconsistent with a provision in the body of this Agreement, however, the provisions of Exhibit "D" and/or "G" shall prevail.

| | |
|---|---|
| Exhibit "A" | Description of Leases, Working Interests of the Parties, Operator and Representatives of the Parties |
| Exhibit "B" | Offshore Insurance Provisions |
| Exhibit "C" | Accounting Procedure |
| Exhibit "D" | Gas Balancing Agreement |
| Exhibit "E" | Certification of Non-segregated Facilities |
| Exhibit "F" | News Release Guidelines |
| Exhibit "G" | Integrated Project Team |
| Exhibit "H" | Policies Regarding Alcohol, Drugs and Other Prohibited Material |
| Exhibit "I" | Intentionally Omitted |
| Exhibit "J" | Safety, Health and Environmental |

## ARTICLE 4.0  SELECTION OF OPERATOR

**4.1   Designation of the Operator:** The Parties agree to the Operatorship as follows:

(a)  Repsol E&P USA Inc. is designated as Operator for all Exploratory Operations on the Contract Area.

(b)  Upon conclusion of Exploratory Operations, Chevron U.S.A. Inc. shall be designated Operator for all other activities and operations conducted on the Contract Area.

The designation of operatorship is subject to approval by the Minerals Management Service and the Parties agree to execute and file such documents as may be required to gain approval of this designation of operatorship.

4.2  **Substitute Operator:** If the Operator becomes a Non-Participating Party in a Non-Consent Operation, any Participating Party may be designated as the substitute Operator, with the same authority, rights, obligations and duties as the Operator, except when:

(a)  the drilling and other contracts for equipment and facilities to be utilized on the Non-Consent Operation are not assignable;

(b)  the operation is conducted from a Production System or Subsea Production System being operated by the Operator; or

(c)  the Non-Consent Operation is an operation conducted in a drilling well subsequent to such well reaching its Objective Depth but prior to release of the drilling unit or vessel used to drill such well.

If no substitute Operator is designated by the Participating Parties, then the Operator at its option, shall conduct such Non-Consent Operations at the sole risk, Cost and expense of the Participating Parties and subject to their control, supervision and direction. If the Operator conducts Non-Consent Operations on behalf of Participating Parties (when the Operator is a Non-Participating Party), the Operator shall furnish the Participating Parties an estimate of the Costs of the Non-Consent Operation. The Operator shall not be required to proceed with such Non-Consent Operations unless and until the Costs thereof have been advanced to it by the Participating Parties, to the end that the Operator need not expend any of its own funds for such Non-Consent Operation. If a Non-Consent Operation conducted by a substitute Operator is completed or results in a Producible Well, said well shall be turned over to the Operator for future operations within thirty (30) days of completion of such operations.

4.3  **Resignation of Operator:** The Operator may resign at any time by giving written notice to the Parties; provided, however, the Operator shall not resign during a Force Majeure situation described in Article 25.1 *(Force Majeure)*. If the Operator no longer owns an interest in the Contract Area, the Operator shall be deemed to have resigned without any action by the Non-Operating Party other than the selection of a successor Operator.

**4.4** **Removal of Operator:** The Operator may be removed for good cause under the following circumstances:

**4.4.1** **Removal for Cause by Vote:** The Operator may be removed for cause by vote of the Parties as a General Matter after excluding the voting interest of the Operator, if the Operator commits any of the following acts:

(a) the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits any act of bankruptcy, or seeks relief under laws providing for the relief of debtors; or,

(b) a receiver is appointed for the Operator or for substantially all of its property and/or affairs; or,

(c) the Operator is found liable for an act of Gross Negligence or Willful Misconduct; or,

(d) the Operator is unable to meet the standards of operation contained in Articles 5.2 *(Workmanlike Conduct)*, 5.3 *(Drilling)*, 5.4 *(Liens and Encumbrances)*, and 5.6 *(Reports to Government Agencies)*; or

(e) the Operator commits a substantial breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of notice of such breach. However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty-day period, and the Operator within said period begins corrective action or steps to correct the breach and thereafter diligently carries such corrective action to completion, the Operator shall not be removed.

To be effective, a vote to remove Operator for any cause described above must be taken within ninety (90) days after a Non-Operating Party receives actual knowledge of the cause.

**4.5** **Selection of Successor Operator:** Upon resignation, or removal of the Operator as provided for in Article 4.4.1, then, a successor Operator shall be selected by the Parties to this Agreement as a General Matter. If the Operator that resigned or was removed fails to vote or votes only to succeed itself, then the successor Operator shall be selected as a General Matter after excluding the vote of the former Operator. If there are only two Parties to this Agreement, the Non-Operating Party shall become the Operator.

**4.6** **Effective Date of Resignation or Removal:** The resignation or removal of the Operator shall become effective at 7:00 a.m. on the first day of the month following a period of ninety (90) days after said notice or vote or such earlier date as may be agreed to by the Parties, unless a longer period of time is required to

obtain approval by the Minerals Management Service.  Prior to the successor Operator's assumption of the Operator's duties, the previous Operator (the "outgoing Operator") shall continue to exercise its authorities and meet its duties as Operator.  Upon selection of a successor Operator, the outgoing Operator shall be bound by the terms of this Agreement as a Non-Operating Party. The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations or liabilities which accrued during the period when the outgoing Operator acted as the Operator.  If the outgoing Operator resigns or is removed, it shall be entitled to charge the Joint Account for the reasonable Costs directly incurred in connection with the change of operatorship unless the Operator is removed pursuant to Article 4.4.1 (c) or (d).

4.7    **Delivery of Property:** On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator possession of everything owned by the Parties pursuant to this Agreement, including all funds owned by the Parties, all Hydrocarbons, all equipment, materials, appurtenances and any other Production Systems, Subsea Production Systems or Facilities used in conducting operations and all books, records, and inventories relating to operations under this Agreement (other than those books records and inventories maintained by the outgoing Operator as the owner of a Working Interest).  Upon such delivery, the outgoing Operator shall be discharged from all future rights and obligations as the Operator except those arising from audits, suits, claims, or settlements attributable to the period during which it operated.  The outgoing Operator shall further use good faith efforts to transfer to the successor Operator, effective as of the effective date of such resignation or removal, its rights as the Operator under all contracts exclusively relating to operations under this Agreement and the successor Operator shall assume all obligations of the Operator thereunder.  As soon as practicable after the effective date of such resignation or removal, the Parties shall audit the accounts and conduct an inventory of all property and all Hydrocarbons, and such inventory shall be used in the return of and the accounting for the property and the Hydrocarbons in respect to this Agreement by the outgoing Operator. Except as provided in Article 4.6 *(Effective Date of Resignation or Removal)*, all reasonable Costs directly incurred in connection with such audit and inventory shall be charged to the Parties.

## ARTICLE 5.0
## RIGHTS AND DUTIES OF OPERATOR

5.1    **Exclusive Right to Operate:** Except as otherwise provided, the Operator shall have the exclusive right and duty to conduct (or cause to be conducted) all operations pursuant to this Agreement. Except as provided in Exhibit "G", the number of employees or contractors used by the Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by the Operator, and

all such employees or contractors shall be the employees or contractors, respectively, of the Operator.  In performing services under the Agreement for the Non-Operating Parties, Operator shall be an independent contractor, not subject to the control or direction of Non-Operating Parties, except as provided in this Agreement.  Operator shall not be deemed to be or hold itself out as the agent or fiduciary of the Non-Operating Parties.

5.2   **Workmanlike Conduct:**  The Operator shall conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice and with that degree of diligence reasonably and ordinarily exercised by an experienced prudent operator engaged in a similar activity under the same or similar circumstances.  The Operator shall not be liable to the Non-Operators for losses sustained or liabilities incurred as a result of its actions as the Operator, except to the extent such may result from its Gross Negligence or Willful Misconduct.  Operator shall never be required under this Agreement to conduct an operation that it believes would be unsafe or would endanger persons or property. Unless otherwise provided, Operator shall consult with the Parties and keep them informed of all important matters.

5.3   **Drilling:** The Operator shall contract for and employ any drilling rigs/vessels, tools machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the operations provided for in this Agreement. The Operator may have all drilling operations conducted by qualified and responsible independent contractors who are not affiliated with the Operator and are employed under competitive contracts.  A competitive contract (including any extensions of such contract with amendatory terms) is a contract that (a) was entered into within five (5) years before the commencement of drilling operations (and provided further that such time period shall run from the date of commencement of initial drilling operations for a new build drilling rig/vessel) and (b) when the contract was entered into, did **not** contain terms, rates and provisions that were materially more burdensome to the Operator than those generally prevailing at that time in the deepwater OCS Gulf of Mexico involving drilling rigs/vessels of an equivalent type, operating in similar environments and water depths, equipped to the Operator's standard conditions, and capable of drilling the proposed well or conducting other required operations within the schedule in the well AFE. The Operator may employ its, or its Affiliates, equipment, personnel, and/or Operator-owned or its Affiliate-owned drilling rig/vessels, workover rig or snubbing in the conduct of such operations in accordance with the Accounting Procedures contained in Exhibit "C" or pursuant to a written agreement among the Participating Parties.  If the Operator's or its Affiliates equipment, personnel, and/or drilling rig, workover rig or snubbing unit are employed in conducting operations under this Agreement, the terms rates and provisions for use shall reflect actual costs consistent with competitive contracts prevailing in the deepwater OCS in the Gulf of Mexico.

**5.4**   <u>Liens and Encumbrances:</u> The Operator shall endeavour to keep the Leases, Production Systems, Facilities and other equipment and any Hydrocarbons free from all liens and encumbrances [except those provided for in Article 6.3 *(Security Rights)*] which might arise by reason of the operations conducted under this Agreement.

**5.5**   <u>Records:</u> The Operator shall keep accurate books, accounts and records of operations hereunder in compliance with the Accounting Procedure in Exhibit "C". Unless otherwise provided for in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party at all reasonable times and during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C".

**5.6**   <u>Reports to Government Agencies:</u> The Operator shall make timely reports to all governmental authorities that it has a duty to make as Operator and shall furnish copies of such reports to Participating Parties. The Operator shall give timely written notice to the Parties of litigation and/or administrative proceedings affecting the Contract Area or operations hereunder.

**5.7**   <u>Information to Participating Parties:</u> The Operator shall, in a timely manner, furnish each Participating Party the following information pertaining to each well operation being conducted hereunder (provided such information was obtained):

    (a)    copy of the application for permit to drill and all amendments thereto;

    (b)    daily drilling and workover reports, which shall include, but which shall not be limited to, the current depth, the corresponding lithological information, drilling fluid characteristics; information about drilling difficulties or delays (if any); daily mud checks, mud logs, MWD/LWD ("measurement while drilling/logging while drilling") information, Hydrocarbon information, daily casing and cementation tallies and cumulative Costs incurred on the operation by posting the same each day to an internet website to which each Participating Party has access or sending the information via e-mail or by fax transmission to each Participating Party;

    (c)    complete report of all core analysis;

    (d)    copies of any logs or surveys as run (including, but not limited to, all digitally recorded data and output of wireline log information);

    (e)    copies of well test results, bottom-hole pressure surveys, gas and condensate analyses, PVT analysis or similar information;

    (f)    copies of reports made to regulatory agencies;

    (g)    forty-eight (48) hours advance notice of logging, coring, and testing operations (or if conditions do not permit, such advance notice as is reasonably possible);

(h) upon written request, and if available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at expense of the requesting Party;

(i) copies of the drilling prognosis and if applicable completion prognosis;

(j) if conventional cores are taken, the Participating Party shall be allowed access to the rig to inspect and evaluate said cores;

(k) samples of Hydrocarbons, if sufficient quantities are available; and

(l) estimates of daily production reports if available.

Upon written request, the Operator shall use good faith efforts to furnish to a requesting Participating Party any additional available information, acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole cost and expense). The costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

**5.8** **Completed Well Information:** Operator shall furnish to each Participating Party the following information pertaining to each completed well:

(a) monthly report of production and injection;

(b) copies of routine reports made to regulatory agencies;

(c) report on status of wells not producing and not abandoned;

(d) a summary of the Hydrocarbons produced during production testing and a statement of any Hydrocarbon imbalances;

(e) bottomhole pressure data and surface pressure data;

(f) composite of all logs run (for example, TDT, Carbon-Oxygen, Spinner Surveys, and Casing Collar), which is technologically feasible; and

(g) reports of inventory of Hydrocarbons in storage.

**5.9** **Information to Non-Participating Parties:** The Operator shall furnish to each Non-Participating Party copies of all non-confidential reports made to regulatory agencies. Such Non-Participating Party shall be entitled to receive the information specified in Article 5.7 (*Information to Participating Parties*) and 5.8 (*Completed Well Information*) after fulfilling the recoupment requirements specified in Article 16.0 *(Non-Consent Operations)*; provided however, any Non-Participating Party shall be entitled to review financial records to the extent necessary to conduct an audit of the payout account for the Non-Consent Operation. A Party which has permanently relinquished all of its Working Interest in the Contract Area shall not be entitled to receive any information specified in Articles 5.7 (*Information to Participating Parties*) and 5.8 (*Completed Well Information*) above. Following completion of a Non-Consent Operation, the

Operator shall also furnish to all other Parties the information set forth in Article 16.1.2 *(Cost Information)* within the time period set forth in that article.

5.10    **Submittal of Mineral Management Service ("MMS") Plans:**  Any Unit Plan of Exploration, Unit Plan of Development and Unit Plan of Operation ("Plan") as required under a Unit Agreement, for the exploration, development and operation of a Unit Area shall be submitted by Operator to the MMS in accordance with a Unit Agreement and the further provisions of this Article.

    5.10.1    **Proposal:**  Operator shall submit to each Non-Operator, at least thirty (30) days prior to filing, a copy of the proposed Plan and each Non-Operator shall either approve or submit written objections to the Operator within ten (10) days of its receipt of the proposed Plan.  If the Plan receives the unanimous approval of the Parties, then such Plan shall be filed.

    5.10.2    **Revised Plan:**  If such Plan does not receive the unanimous approval of the Parties, and Operator receives written objections thereto as provided in Article 5.10.1, then Operator shall submit to the Parties a revised Plan at least fifteen (15) days prior to filing, taking into account the objections made to the first proposed Plan.  If no Plan receives the unanimous approval of the Parties, then Operator shall file with the MMS a Plan taking into account, to the extent possible, the various views expressed by the Parties.

    5.10.3    **Rejection of Plan:**  If the MMS rejects a Plan filed by Operator, Operator shall initiate a new Plan in the same manner as provided in Section 5.10.1 and the procedure with respect thereto shall be the same as in the case of an initial Plan.

    5.10.4    **Notice of Approval or Disapproval:**   If a Plan is approved or disapproved by the MMS, Operator shall give prompt written notice of that fact to each Party.

    5.10.5    **Supplemental Plans:**  If any Party or Parties shall have Elected to proceed with a proposed operation in accordance with the provisions of this Agreement, and such operation is not provided for in the current Plan approved by the MMS, Operator shall either (a) submit to the MMS for approval a supplemental Plan which includes such operation or (b) request the MMS to consent to the inclusion of such operation in the Plan, if such consent is sufficient.

    5.10.6    **Copy of Plan :**  Each Party to a Unit will receive a copy of the Plan that is filed with the MMS.

Buckskin Operating Agreement                          Page 16

**5.11** **Safety, Health and Environment:** · In fulfilling its obligations hereunder, the Operator shall act in accordance with the provisions of Exhibit "J" (Safety, Health and Environment).

**ARTICLE 6.0**
**EXPENDITURES AND ANNUAL OPERATING PLAN**

**6.1** <u>Basis of Charges to the Parties:</u>   Except as otherwise provided, the Operator shall pay all Costs incurred under this Agreement and each Participating Party shall reimburse the Operator, in proportion to its Participating Interest, for such Costs.  The Operator shall have the right to require each Participating Party to advance its respective share of estimated expenditures, as provided in Exhibit "C".  Funds received by the Operator under this Agreement may be commingled with Operator's own funds.  All charges, credits, and accounting for expenditures shall be made pursuant to Exhibit "C", attached hereto.

**6.2** <u>Authorization for Expenditure:</u>   Subject to Article 6.2.1 (*Required Authorization*), the Operator shall not make any single expenditure or undertake any project or operation costing Five Hundred Thousand Dollars ($500,000) or more, unless an Authorization for Expenditure (AFE) has either: (1) been included in a proposal for an operation and approved by the Participating Parties through their Election to participate in the operation, or (2) received the approval of the Parties as a General Matter.  For any single expenditure or project costing in excess of Two Hundred Thousand Dollars ($200,000), but less than Five Hundred Thousand Dollars ($500,000), the Operator need not submit an AFE, but shall furnish written information describing the expenditure to each of the Participating Parties.  In the event of an emergency and notwithstanding the foregoing, the Operator shall be empowered to immediately make such expenditures for the Joint Account of the Participating Parties as, in its opinion as a reasonable and prudent operator, are required to deal with the emergency.  The Operator shall report and submit any required AFE to the Participating Parties, as promptly as possible, the nature of the emergency, action taken, and Costs incurred. The Operator is also authorized to conduct operations and incur expenses reasonably required by statute, regulation, orders or permit condition or by a government authority having jurisdiction, which expense shall be borne by the Participating Parties in the affected operations.

    **6.2.1** <u>Required Authorization:</u> Prior to making any expenditure of less than Five Hundred Thousand Dollars ($500,000) that requires the utilization of a drilling or workover rig, the Operator shall obtain the approval of the Parties as a General Matter.

    **6.2.2** <u>AFE Overrun Notice:</u>  Operator shall provide an AFE overrun notice for informational purposes only to all Participating Parties whenever the latest

approved AFE is exceeded by Fifteen per cent (15%) or Five Million Dollars ($5,000,000.00), whichever first occurs.

6.2.3   **Supplemental AFE for Cost Overruns:** If it appears (based upon the Operator's reasonable estimate) that the actual Costs associated with an original AFE, or its latest approved supplemental AFE, will exceed the relevant Permitted Over-expenditure, as defined below, the Operator shall promptly submit a supplemental AFE to the Participating Parties. Subject to Article 8.3 (*Response Time for General Matters and Elections*), after receipt of the supplemental AFE each Participating Party shall have the right to make an Election as to its further participation in the approved activity or operation. If a Participating Party Elects to participate in the proposed supplemental AFE and such Party is willing to bear one hundred percent (100%) of the Cost set forth in the supplemental AFE, the Operator shall continue to conduct the approved activity or operation associated with the supplemental AFE at the sole Cost and risk of such Party. Any Participating Party in a current AFE Electing not to participate in an approved supplemental AFE shall become a Non-Participating Party in the activity or operation associated with the original AFE once the actual Costs expended on the activity or operation exceed the Permitted Over-expenditure amount of the last AFE in which the Non-Participating Party Elected to participate, without regard to whether all the activities or operations (including plugging and abandonment) in the original AFE have been conducted at the time of its Election not to participate. A Non-Participating Party in a supplemental AFE shall be subject to the same provision in Article 16.0 (*Non-Consent Operations*) that would apply to a Party Electing or voting not to participate in the originally approved activity or operation. If a supplemental AFE described in this Article 6.2.3 is not approved by any Party, the Operator shall conclude the activity or operation as soon as practical, and each Participating Party in the original AFE, or its latest approved supplemental AFE, will be responsible for its Participating Interest share of the Costs of the activity or operation, including Costs in excess of the Permitted Over-expenditure. Notwithstanding the foregoing, **no** Party shall be allowed to make an Election **not** to participate in a further operation during a Force Majeure or other emergency as described in Article 25.1 (*Force Majeure*), but may make its Election not to participate after termination of such emergency.

6.2.3.1   **Supplemental AFE for Cost Overruns on Wells and Well Operations at Objective Depth:** The Permitted Over-expenditure for the Exploratory Well, an Appraisal Well, or a Development Well, or for operations in any such well after it has reached its Objective Depth, is an amount equal to twenty percent (20%) of the original approved AFE, or its latest approved

supplemental AFE, for the well or subsequent operation or Ten Million Dollars ($10,000,000), whichever is less.

6.2.3.2 <u>Supplemental AFE for Cost Overruns on the Integrated Project Team AFE:</u>  The Permitted Over-Expenditure for the Integrated Project Team is an amount equal to twenty percent (20%) of the original approved Integrated Project Team AFE, or its latest approved supplemental AFE, or Ten Million Dollars ($10,000,000), whichever is less.

6.2.3.3 <u>Supplemental AFE for Cost Overruns on Final Design AFE:</u> The Permitted Over-expenditure for the Final Design AFE is an amount equal to twenty percent (20%) of the original approved Final Design AFE, or its latest approved supplemental AFE, or Ten Million Dollars ($10,000,000), whichever is less.

6.2.3.4 <u>Supplemental AFE for Cost Overruns on Fabrication AFE:</u> The Permitted Over-expenditure for any separate AFE submitted under the approved Fabrication AFE shall be the amount provided in Article 12.11 *(Cost Overruns on Fabrication AFE)*.

6.2.3.5 <u>Supplemental AFE for Cost Overruns on All Other AFEs:</u> The Permitted Over-expenditure for all other AFEs is an amount equal to twenty percent (20%) of the original approved AFE, or its latest approved supplemental AFE, for the activity or operation or Five Million Dollars ($5,000,000), whichever is less.

6.3 <u>Liens, Mortgages and Security Rights:</u> In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operating Parties herein, the Parties shall have the following security rights:

6.3.1 <u>Lien, Mortgage and Pledge:</u> Each Non-Operating Party (i) grants a lien in, with respect to any portion of the Contract Area that is not located offshore adjacent Louisiana, and (ii) mortgages, pledges, affects, and hypothecates, with respect to any portion of the Contract Area that is located offshore adjacent Louisiana, to Operator, and Operator (i) grants a lien in, with respect to any portion of the Contract Area that is not located offshore adjacent to Louisiana, and (ii) mortgages, pledges, affects, and hypothecates, with respect to any portion of the Contract Area that is located offshore adjacent Louisiana, to the Non-Operating Parties, all of its respective right, title, and interest in and to the following:

Buckskin Operating Agreement                    Page 19